**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

CASE NO. _____

**BARBARA MANCE**,

     Plaintiff,

vs.

**STRYKER CORPORATION**, a
Michigan corporation,

     Defendant.

_____/

## COMPLAINT

Plaintiff, Barbara Mance (Mance), by and through her undersigned counsel, sues Defendant, Stryker Corporation (Stryker), and states as follows:

### JURISDICTION AND VENUE

1.    This is an action brought by Mance against Stryker, her former employer, for violations of 42 U.S.C. §2000e *et seq*., Title VII of the Civil Rights Act (Title VII) and Chapter 760, Florida Statutes, the Florida Civil Rights Act (FCRA).

2.    This Court has federal question jurisdiction over Mance's Title VII claims pursuant to 28 U.S.C. §1331 as well as pendent jurisdiction over her state law claims pursuant to 28 U.S.C. §1367.

3.    Venue is proper in this jurisdiction where the actions giving rise to the causes of action occurred in Palm Beach County, Florida.

1

## THE PARTIES

4.     Mance is an individual over the age of 18 and is a resident of Palm Beach County, Florida.

5.     Stryker is a Michigan corporation which does business throughout the United States, including South Florida where Mance lives and performed work on behalf of Stryker.

## FACTUAL ALLEGATIONS

6.     Mance was initially hired by Stryker as an Associate Sales Representative in 2010 for the South Florida territory reporting directly to Steve Markun who in turn reported directly to Derek Mueller.

7.     Over the years, Mance was promoted to Sales Representative, winning awards and promotions for her hard work and dedication.  Indeed, throughout most of her tenure, she received positive reviews, pay raises and significant bonuses for not only meeting but exceeding her quotas.

8.     Mance's direct supervisor during most of her employment and through her termination was Derek Mueller (Mueller).  Mueller was, at all material times, a Regional Sales Manager overseeing the Atlantic/Southeast region.

9.     Mueller, who directly supervised between five to ten Sales Representatives throughout the time he directly supervised Mance, created and condoned a work culture permeated with gender bias, discrimination and harassment.

### The Subtle Discrimination Begins

10.     Starting as early as November 2011, Mance began to notice that she was not being treated the same as her similarly situated male colleagues and that her sales group, which reported to Mueller, was really an all Boys' Club and that she, as a female, was not welcome.

2

11.     In particular, the first instance of discrimination occurred when Mueller discussed promoting Mance but in doing so suggested taking away her support staff and giving away an established and profitable portion of her territory to a male colleague, Brian Lee, claiming he was unsure Mance could handle the entire territory (inferring that Lee, a male, with similar tenure to Mance, could).

12.     Similarly situated males were not given territory or support cuts.  Fortunately, however, Steve Markun, who Mance replaced, fought for her to keep the territory as-is, because he informed Mueller it was unfair to give Brian Lee an instant pay increase while limiting Mance's opportunities to achieve quota.  Reluctantly, Mueller agreed.

13.     By December 2011, Steve Markun was promoted to Regional Sales Manager but Mance was told by Mueller that Markun would get paid on any sales through January 2012, even though she was running the entire territory since November 2011.  Mueller also "grand-fathered in" a number of capital deals which Markun was to be paid on as long as the deals closed by June 2012.  Similarly situated males were not required to share their commissions.

14.      During that time, Mueller also requested that Mance complete a daily tracker so he could see exactly how Mance spent her time and what opportunities she was working on, while other similarly promoted male representatives, Brian Lee and Bert Heath who also reported to Mueller, were not required to do so.

15.     Further, when Mance's quota was set for 2012, it was set as $1,500,000, which was the same quota as Steve Markun, an eight year sales veteran, who Mance replaced.

16.     Steve Markun is a male and his quota in 2011 was also $1,500,000 the year before Mance replaced him.  Typically, Mueller awarded territories with "quota breaks" after over-

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

achievement because of a depleted pipeline.  Despite Markun selling $500,000 over quota in 2011, no quota break was given to Mance as a Rookie for 2012 with no established business and a depleted pipeline.

17.     Of significance, during Mance's tenure as a Sales Representative from 2012 through 2018, Mance absorbed greater quota increases than all other male-run territories within Mueller's region.  In one shocking example, Mance had three times the quota increases of both the Orlando and Tampa territories combined, both of which were run by men.

**The Discrimination Becomes More Blatant**

18.     By 2013, Mance's quota was substantially increased.  Now, Mance was required to obtain $1,750,000 in revenue for Stryker, which was an increase greater than that of her neighboring veteran territories which were run by Bert Health and Brian Lee both men. When Mance took the 2012 promotion, both of those territories were either equal (Orlando, $1,500,000) or greater than her quota (Tampa, $1,550,000).

19.     Mance inquired with Mueller about the increase and expressed concern over long term sustainability.  Mueller dismissed her concerns claiming he could have raised it more, but did not.  Interestingly, Mance's quota was increased $50,000 more than the territories run by Bert Heath and Brian Lee.

20.     Despite the quota increase that year, Mance met and exceeded her quota, winning the Stryker Rolex Award and breaking all previous historical territory sales records set by veteran Steve Markun while he ran the South Florida territory.  Yet despite her repeated success, a male, Jeff Smith was elected for 2014 President's Council, not Mance.  Mance was told it was because Jeff Smith had a longer tenure.

4

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

21.     Feeling deflated at the National Sales Meeting in Scottsdale, Arizona, Mance approached her mentor Steve Markun, now a Stryker Surgical Regional Sales Manager, telling him she felt bullied by Mueller who she felt did not respect her as a woman.  In response, Mance was told that she needed to start acting like one of the guys, stay up and have a few beers with them instead of going back to her room after work activities.  Mance explained to Markun, that she had no desire to throw back with people who treated her like garbage even if it was playing politics and that she was not interested in getting drunk and going to strip clubs like the male representatives do at work events.

22.     On the last day of the National Sales Meeting, Bert Heath showed up at the Regional Meeting Event wearing the same clothes he had been wearing the day before.  When asked about it, Bert Heath commented there was vagina slime on his pants from the strip club to which Mueller responded by laughing.

23.     In 2014, once again, Mance's quota was increased.  This time her quota was raised to $2,000,000 – an increase that was significantly more than her similarly situated male counterparts.  Mance's territory quota requirement was now equivalent to the entire State of Georgia. Previous to Mance, the Georgia territory was always at the highest end of quota demands.

24.     By February 2014, after receiving an unprofessional email from Brian Lee, which copied Mance's Associate Sales Representative, Curtis Lazar, Mance contacted Mueller complaining about the Boys' Club asking that the inappropriate behavior, differential treatment and bullying be stropped.  Mueller agreed saying he would address the situation with Brian Lee, Craig Moody and Jeff Smith.

5

25.     Unsure Mueller would follow through, Mance contacted Lisa Kloes, NSE Group Marketing Manager, a women's mentor, complaining about the differential treatment, the all Boys' Club and how Mueller not only allowed it, but encouraged it.  Ironically, Lisa Kloes directed Mance to address it with Mueller, the same person who condoned the unlawful behavior.

26.      Reluctantly, Mance then called Mueller to complain about her treatment and Mueller advised her that he would take care of it, agreeing with Mance that Craig Moody, Brian Lee, and Jeff Smith were out of line and that he would address it with each of them but the discriminatory all Boys' Club culture continued.

27.     Weeks later, Mance attended a product partnership training for Neurologica in Boston, Massachusetts where she was harassed by Kiffin Wiggert, a male and former Associate Sales Representative that worked under Brian Lee and Bert Health, and ultimately reported to Mueller.

28.     After the incident, Mance emailed Mueller demanding that the culture that was promoted and condoned in his region stop.  She also inquired if he had confronted Brian Lee, Bert Heath and Craig Moody about the harassment as he had promised. He responded that he only spoke to one representative about their inappropriate behavior, Craig Moody.

29.     In spite of the treatment, in 2014, Mance hit her quota with $2,031,643 in annual sales for Stryker.

30.     In 2015, Mance's quota was raised once again, this time to $2,025,000.  Mance's quota remained the same as the entire State of Georgia, which as stated, was a territory that historically had a much higher quota than the South Florida territory run by Mance.

6

31.    In response to the questionable quota increase, Mance confronted Mueller and asked how the quota was determined and what accounted for the increase, but Mueller had no response claiming only that it was based on a certain "metrics."  Mance's male counterparts did not have similar increases and were given "quota breaks" after a year's over performance.  Mance did not experience such a quota break, despite her over-performance in 2014.

32.    In July 2015, Mance emailed Mueller that she was getting married on October 17, 2015 and asked for coverage for her territory.  Mueller confirmed by sending an email to Mance on October 7, 2015 stating that Brian Lee's Associate Sales Representative, Michael Prieto, would be in Mance's territory to provide clinical needs and coverage for sales evaluations for October 19-21.

33.    Mance married on October 17, 2015, taking a mini-moon with her husband four days thereafter.

34.    On October 27, 2015, after returning from her mini-moon, Mance learned that Mueller "forgot" to provide Mance the requested coverage for a one-week, Clinical Evaluation at Broward General Medical Center that had budgeted $1,500,000 for the execution in December 2015.

35.    Since there was no Stryker representative sent to the evaluation, Broward General Medical Center subsequently chose to purchase from a competitor.

36.    Mance also learned that during her brief absence Memorial West Hospital was denied clinical support coverage on October 19, 2017, because Mueller sent her scheduled clinical support, Michael Prieto, to assist Brian Lee instead of her as previously agreed. Mance was days away from finalizing the transaction ($190,000 that would have put her over 2015 quota), but

7

because of the unreliability of Stryker for emergent brain surgery procedures, Memorial Hospital West invited Mance's competitor, Medtronic, to come in for an evaluation.

37.     For three years prior, Mance never experienced a competitive threat, but because of Mueller's failures to provide her with the requested coverage, Mance lost two deals that she spent significant time developing either one of which would have placed her above quota had they closed.

38.     Mueller was aware that both deals were needed for Mance to reach her quota, as per Mance's and Mueller's email correspondence on May 4, 2015 confirming such.

39.     That same day (October 27, 2015 - after learning Mueller did not provide the required coverage), Mance reached out to Yanice Piccone in Human Resources to complain about Mueller and his actions.

40.     During the call with Yanice Piccone, Mance complained that she was dealing with bullying, gender discrimination, preferential treatment for male representatives who reported to Mueller and crazy quota hikes to protect Mueller's male reports.  In response, Yanice Piccone suggested that Mance speak with Kevin Geraghty, the Director of Sales.[1]

41.     On October 28, 2015, the next day, Mance spoke with Kevin Geraghty and discussed the years of gender discrimination, unsubstantiated quota increases, her concerns regarding quotas, being passed over for leadership opportunities within Stryker (namely President's Council),  the all Boys' Club culture and the tipping point that Mueller "forgot" to provide mandatory clinical support (Michael Prieto) to Broward General Hospital for the first Ziehm evaluation nationally, which Mance needed to close to make her quota at the end of the

---

[1] Mance later learned that Yanice Piccone and Kevin Geraghty never documented these conversations, which was confirmed by Dena Trulove and Julie Winans from Human Resources in April 2016.

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

year.  Additionally, the lack of support for Memorial Hospital West delayed the promised close date by months because the competitor was brought in. Kevin Geraghty responded that it was "really bad" and that he would speak with Mueller, which he confirmed he did on October 30, 2015.

42.     Notwithstanding, Mance lost the Broward General Hospital deal to her competitor ($1,500,000), delayed Memorial Hospital West to a competitor ($190,000), and as a result came up short by $139,000 for her annual quota.

43.     This was the first time Mance missed her quota and she was devastated.  However, her annual sales were still $1,911,000, which was more than the majority of her region, including Craig Moody, Tanner Forster, Anthony Ribiero and Callie Burns.

44.     Of significance, Kevin Geraghty granted Mance a contingency order for her 2015 quota after Mance attempted to rescue the sales order from Memorial Hospital West. Mance called Kevin Geraghty and pleaded her case, because of Kevin Geraghty's knowledge of what took place earlier in October 2015.  Kevin Geraghty, in turn, spoke via telephone with the Memorial Hospital West CFO, Kevin Corcoran.   During their conversation, Kevin Corcoran promised a purchase order by February.  After the call, Kevin Geraghty mistaking believed the deadline for the purchase order was January.  As such, at the end of January 2016, Kevin Geraghty demanded the purchase order and Kevin Corcoran emailed him that it would not be until February as stated in their prior conversation.  Kevin Geraghty then backed out the order, stripping Mance of quota achievement for 2015. Kevin Corcoran finalized the deal the second week of February, but Mance still missed her quota.

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

45.     In 2016, Mance's quota was lowered to $1,875,000, which was the result of a national quota reduction for Stryker Navigation that all representatives, males and females received.

46.     That year, Mance met her quota and exceeded it, closing out the year with $1,912,637 in sales, exceeding her annual quota and earning the second highest sales dollars in Mueller's region.

47.     That year, however, Craig Moody was chosen for President's Council despite Mance's longer tenure and higher annual sales.

### The Discrimination Continues and the Retaliation Begins

48.     In 2017, Mance's quota was increased once again and Mance knew it would be difficult to make her quota given her depleted pipeline, after years of excessive quota increases, and challenges due to the change in Service order credit that was enforced beginning in 2015, with the greatest impact on the salesforce for 2017.

49.     As such, Mance reached out to Mueller and asked him to consider giving her an opportunity to add additional accounts to her territory due to the departure of Brian Lee in the Tampa territory.

50.     Mueller denied Mance's request and gave Bert Heath the entire profitable portion of Brian Lee's former territory.  Instead of the opportunity Mance requested, she was given 0% of Brian Lee's prior annual business and only a few scrap accounts that historically never produced Navigation Sales and had known financial troubles.

51.     When other Sale Representatives left, Mueller gave male representatives opportunities to hit their quota.  Specifically, in 2015, Craig Moody was given over $250,000 in

10

annual residual Navigation business from a portion of Tennessee territory (Knoxville) just to help him out, which included an additional headcount. That same year (2015), Mueller also stole headcount from female representative, Callie Burns, to assist Craig Moody in hitting his quota. The following year, in 2016, Scott Fendler, who ran the Georgia territory, was given the greater part of Tennessee to increase his earnings. These opportunities, which were provided to Mance's male colleagues and not her, not only provided the male Sales Representatives with instant residual business to hit their quota, but also additional support personnel to provide their accounts with mandatory clinical support, allowing the representatives to sell more.  Mance, a female, was not afforded with such opportunities.

52.     Following his 2017 quota decision for Mance and the denial of the opportunity for growth with the departure of Brian Lee, Mueller requested a meeting with Mance and Kevin Geraghty.   Feeling uncomfortable, Mance declined and contacted Julie Winans from Stryker's Human Resources Department.

53.     Julie Winans suggested a meeting with Mance, Mueller and Kevin Geraghty to discuss Mance's concerns.  Again, Mance declined saying it was inappropriate for her to address her continued concerns with Mueller directly because he not only created the culture of gender discrimination but continued to condone it.  Julie Winans then suggested Mance meet only with Kevin Geraghty to discuss her concerns regarding the gender discrimination.

54.     As such, Mance met with Kevin Geraghty on February 2, 2017.

55.     During the meeting, Mance discussed the years of unfair quota increases versus her male counterparts, preferential treatment of males over females, bullying, harassment, the inappropriate environment (where she was forced every year at her regional sales meetings with

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

the Atlantic/Southeast region team to share a home rented by Mueller with her male colleagues where her male colleagues drank excessively and brought back women to the home to have sex), repeatedly being passed up for leadership opportunities (Presidents Council), and gender discrimination towards her and other female colleagues from Mueller.

56.     Kevin Geraghty seemed understanding, promised a change in Mueller's behavior and stated that he would discuss these issues with Mueller one-on-one to correct his unlawful behavior.  Kevin Geraghty promised a follow up telephone call with Mance and Mueller to discuss change moving forward after he spoke with Mueller.

57.     The next day, on February 3, 2017, Mance received a telephone conference call invite for Mance, Kevin Geraghty and Mueller, which occurred the same day.

58.     On the conference call, Mueller defended his discriminatory behaviors and demanded that Mance admit that he never discriminated against her or any other woman. Mance declined because it was not true.

59.     In response, Mueller became very angry and demanded that Mance put in writing to him via email a list of his discriminatory treatment.

60.     Shocked by the conference call and fearing retaliation, Mance contacted Julie Winans via email and detailed the conference call that took place on February 3, 2017.

61.     In the email, Mance protested that it was unfair that she complained about the ongoing gender discrimination and now was being retaliated against by Mueller who demanded she rescind her statements.

62.     Julie Winans then called Mance and apologized for the handling of the conference call and told her that going forward all sensitive matters (quota, territory changes, support staff,

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

etc.) would go through Kevin Geraghty directly and not Mueller. However, there would be no adjustments to the 2017 territory expansion which would have provided Mance with the opportunity to make her quota.

63.     Shortly thereafter, Kevin Geraghty moved into a different position within Stryker and the promises made regarding his oversight never occurred.

64.     While Mance tried to make the sales required to meet her 2017 quota, she lacked the support staff she needed due to absences of her staff for medical and other reasons. When Mance requested additional fill-in staff from Mueller to cover mandatory clinical needs to allow her to sell, Mueller knowing Mance would have trouble meeting her quota without the help, repeatedly declined.  With a heavily depleted pipeline for 2017, Mance missed her quota by $621,045 but still generated sales for Stryker in the amount of $1,243,955.

65.     As a result, on February 7, 2018, Mance was placed on a Performance Improvement Plan (PIP) for missing her quota in 2015 and 2017, even though Mance not only met but exceeded her quota in 2016.

66.     The PIP specifically stated that it was an opportunity for Mance to improve her performance and that Stryker stood by her to help her in any way it could so that her PIP could be successfully concluded, but that never happened.

67.     The PIP took effect on February 6, 2018, and lasted through June 30, 2018.  While Stryker received the right to shorten the PIP if Mance was not making an effort to improve her performance, it also gave Stryker the right to extend the PIP if she was showing substantial progress towards successful completion.

13

68.     Further, Mance was required to achieve a minimum of 80% of her quota ($820,000) by June 30, 2018.

69.     Mance's PIP was far more aggressive than any PIP given to any similarly situated male Sales Representative, including male Sales Representatives in other regions.

70.     Specifically, Tanner Forster, a male who also reported to Mueller, missed his quota twice and Mueller issued him a verbal PIP stating that he was required to meet 50% PTQ by June 30, 2018, or Mueller would place him on a written PIP.  Tanner Forster did not meet those requirements by June 30, 2018 and was not placed on a written PIP.

71.     For reasons that can only be explained by discrimination and retaliation, 2018 was the only year Stryker claimed its policy was to make PIPs mandatory where a Sales Representative missed their quota in two years even if those years were not consecutive.  That said, in all years, Regional Managers such as Mueller always maintained discretion in how PIPs were administered.

72.     Feeling that she continued to be discriminated and now retaliated against by Mueller, Mance scheduled a conference call with Julie Winans and Lisa Rudnick in Human Resources on February 9, 2018, prior to signing the PIP to ensure all PIP numbers were accurate due to the aggressive nature.

73.     During the telephone call, Mance voiced her concern that Mueller had discretion over her PIP despite Stryker's previous promises that Mueller would hold no such control. Julie Winans dismissed the concerns and ensured all numbers were valid according to the new 2018 matrix created by Mueller, and the PIP was in place to help her.

74.     On June 5, 2018, Mueller sent an email to the Sales Representatives in his region wishing Bert Heath a happy birthday, which included a photo of a birthday cake with a penis

14

candle.

75.     Unbeknownst to Mance at the time, Lisa Rudnick spoke with Steve Markun earlier that month at a corporate meeting where Steve Markun voiced his concerns over Mance's treatment, discrimination and retaliation by Mueller. Lisa Rudnick stated that while she had observed inappropriate behavior with Sales Representatives from Mueller's region and she "smelled a rat," she could not help Mance unless Mance achieved her PIP goals.

76.     Upon learning about the conversation between Lisa Rudnick and Steve Markun, Mance scheduled a telephone call with Lisa Rudnick on June 22, 2018.

77.     During the call, Mance inquired about Lisa Rudnick's knowledge of previous complaints and she stated she "had no context."  Lisa Rudnick instructed Mance to attain PIP goals and after they would discuss why Mueller was unfit to manage Mance moving forward.

78.     Despite the aggressive nature, Mance continued to work hard and was on track to successfully complete her PIP.

79.     On June 29, 2018, Mance forwarded an email correspondence from Susan Takacs (COO of Physicians Regional Medical Center) to Mueller, Lisa Rudnick, Lisa Kloes, Jim Marucci (General Manager), and John Bowencamp (Sales Director) to advise them of a pending purchase order that would be released within days for $397,000, which would result in Mance attaining her PIP goal and quota for the year.

80.     On June 30, 2018, in a last attempt to be heard, Mance forwarded Lisa Rudnick an email that she had initially sent to Julie Winans in February 2017, outlining the years of complaints, discrimination and retaliation. Because Rudnick had previously said she had "no context," Mance urged Lisa Rudnick to do her own due diligence and investigate prior to any decision being made

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

to terminate Mance's employment.

81.     Unfortunately, Lisa Rudnick and Stryker leadership did not respond and instead Mance was terminated on July 3, 2018.

82.     Ultimately, the deal from Physicians Regional Medical Center was received weeks later in July 2018.  Mance received no commissions for the deal.  Instead Alec Bleacher, a less qualified male who replaced Mance, received the entire commission ($47,640) and quota credit ($397,000) for the deal despite not even taking the position until August 2018.

83.     Ironically, Mueller who once allegedly granted Mance a contingency order in 2015 to help her meet her quota, was no longer willing to give her the same opportunity given Mance's complaints about him, his unethical failings as a manager and his unwillingness to treat male and female Sales Representatives the same.

84.     While Stryker claimed at the time Mance's termination was solely due to her failure to meet 80% of her quota by June 30, 2018, Mueller later admitted that the firing of Mance was not due to performance, but rather "personal reasons."

85.     Specifically, while Mueller was conducting an interview with Chris Mokhiber in April 2019 for the vacant Orlando/Tampa territory, Mueller disclosed that he fired Mance because he did not "see eye to eye with her."

86.     Indeed, Mance was terminated in retaliation for complaining about Mueller and his failure to prevent gender bias and discrimination.

87.     By the end of 2018, the South Florida territory achieved over $2,400,000 in sales, all forecasted and budgeted projects that Mance secured and relayed to Stryker leadership prior to her departure.

16

88.     That year, the South Florida territory set new records because of Mance's efforts, and Alec Bleacher received Rookie of the Year and Master Achiever.

89.     As a result of Stryker's unlawful actions, Mance has hired the law firm of Becker & Poliakoff, P.A., and has agreed to pay it all reasonable attorneys' fees and costs incurred by it for rendering services on her behalf.

90.     All conditions precedent have been performed, occurred or have been waived.

<u>COUNT I</u>
**Title VII and FCRA - Gender Discrimination**

91.     Mance re-alleges and re-affirms the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92.     This is an action against Stryker for gender discrimination pursuant to Title VII and the FCRA.

93.     Mance is a female and is therefore a member of a protected class.

94.     Mance was qualified for the position(s) she held while employed by Stryker.

95.     She was treated adversely by Mueller and ultimately terminated from her employment after complaining to Stryker about the gender discrimination and bias of which she suffered by Mueller and others.

96.     Specifically, Stryker took action or allowed action to be taken against Mance because she is female.  During Mance's employment with Stryker, she was harassed and treated differently than her similarly situated male colleagues with no action taken by Stryker to prevent or otherwise correct the known problem.  Then after repeated notice of gender based harassment and other forms of discrimination described herein, Stryker took no action and caused additional harassment, discrimination and harm to Mance, including without limitation her termination.

17

97.     Indeed, Mance was treated less favorably than her similarly situated male colleagues.

98.     Stryker knew or should have known of the sex/gender discrimination perpetuated and condoned against Mance and failed to take prompt, adequate and remedial action or took no action at all to prevent the unlawful abuses to Mance.  The events set forth herein, at least in part, ultimately resulted in Mance's termination.

99.     Stryker knowingly condoned and ratified the discrimination.

100.    The discrimination complained of herein, affected a term, condition or privilege of Mance's continued employment with Stryker.

101.    Stryker's conduct and failures constitute intentional discrimination and unlawful employment practices based on gender/sex in violation of state and federal laws applicable to this action.

102.    As a direct and proximate result of Stryker's conduct described herein, Mance has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, benefits, bonuses, commissions, and other tangible and intangible damages.  These damages occurred in the past, yet are permanent and continuing.

## COUNT II
### Title VII and FCRA – Retaliation

103.    Mance re-alleges and re-affirms the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

104.    Stryker is an employer as that term is defined under the applicable statutes referenced herein.

18

105.     The foregoing allegations establish a cause of action for unlawful retaliation after Mance continually reported unlawful employment practices adversely affecting her and her employment with Stryker under 42 U.S.C. §2000e *et seq*., Title VII of the Civil Rights Act and Chapter 760, Florida Statutes, the Florida Civil Rights Act.

106.     The above described allegations by Stryker were purposeful.

107.     Mance engaged in protected activity numerous times throughout her employment with Stryker when she complained to management and Stryker's Human Resources Department about the gender discrimination and specifically the discrimination by her supervisor Mueller.

108.     After complaining to Stryker, Mance was given increased quotas which Mueller knew she could never obtain, refused to provide her with additional support and opportunities, placed her on a PIP and ultimately terminated her employment as a result of her complaints.

109.     Indeed, Mance's protected activity is causally related to the adverse employment actions of which she suffered and her ultimate termination in that all adverse employment actions were made, initiated or involved Mueller and Mance's termination occurred days after her last complaint of discriminatory treatment by Mueller.

110.     Further, while Stryker may claim it had a legitimate non-retaliatory reason for Mance's termination, the same is not worthy of belief because Mueller later admitted he terminated her for "personal reasons" and because he did not see "eye to eye with her."

111.     As a direct and proximate result of the foregoing unlawful acts and omissions, Mance has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damages to her reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages occurred in the past, yet are

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444

permanent and continuing.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Mance prays for the following relief:

(a)      that process issue and this Court take jurisdiction over this case;

(b)      that this Court grant equitable relief against Stryker under the applicable counts set forth above, mandating Stryker's compliance with the laws enumerated herein and providing other equitable relief to Mance;

(c)      enter judgment against Stryker and in favor of Mance awarding her damages from Stryker for its violations of the law as stated herein as well as interest;

(d)      enter judgment against Stryker and in favor of Mance permanently enjoining Stryker from future violations of the laws stated herein;

(e)      enter judgment against Stryker and in favor of Mance awarding Mance her attorneys' fees and costs; and

(f)      grant all such further relief as deemed just and proper under the circumstances.

20

## <u>DEMAND FOR JURY TRIAL</u>

Mance demands a trial by jury against Stryker on all issues so triable.

Respectfully submitted this 3rd day of October 2019.

> BECKER & POLIAKOFF, P.A.
> *Counsel for Plaintiff, Barbara Mance*
> 625 N. Flagler Drive, 7th Floor
> West Palm Beach, FL 33401
> Tel: (561) 655-5444
> Fax: (561) 832-8987
> Email: jdokovna@beckerlawyers.com
> Alt. Email:  bmichenfelder@beckerlawyers.com
>
> *By:  /s/ Jamie B. Dokovna*
>     Jamie B. Dokovna, Esq.
>     Florida Bar No. 592722

ACTIVE: 12817597_5

LAW OFFICES
BECKER & POLIAKOFF, P.A.
625 N. FLAGLER DRIVE • 7TH FLOOR • WEST PALM BEACH, FL  33401
TELEPHONE (561) 655-5444